Ruth HILL, Plaintiff,

v.

TACONIC DEVELOPMENTAL DISABILITIES SERVICES OFFICE, a subdivision of the New York State Office of Mental Retardation and Developmental Disabilities, David Sucato, Dan McNeil and Katherine Bainer, Defendants.

No. 00 CIV 4631 CM.

United States District Court, S.D. New York.

Jan. 4, 2002.

Michael H. Sussman, Law Offices of Michael H. Sussman, Goshen, NY, for plaintiff.

Laura V. Jones, Eliot Spitzer, Attorney General, New York City, for defendants.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING THE MOTION IN PART

McMAHON, District Judge.

Plaintiff Ruth Hill sues the Taconic Developmental Disabilities Services Office ("Taconic DDSO"), and her supervisors David Sucato, Dan McNeil and Katherine Bainer, under 42 U.S.C. §§ 1981, 1983 and 2000e *et. seq.* ("Title VII") and New York Executive Law § 296 for employment discrimination based on her race.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### FACTUAL BACKGROUND

On a motion for summary judgment, the Court views the facts most favorably to the non-moving party—in this case, the plaintiff—and draws all inferences in the plaintiff's favor. *See Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

Plaintiff is a fifty-seven year-old black woman who began working in 1991 for Taconic DDSO, a subdivision of the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"), as a Developmental Aide II ("DA II"). Plaintiff worked at the Wassaic, New York campus ("Wassaic"), which houses several hundred developmentally disabled adults. As a DA II, plaintiff was responsible for supervising direct care staff. Plaintiff was one of the few African–American supervisors at Wassaic. (Hill Aff. at ¶ 4.)

Defendant Dan McNeil, a DA III at Wassaic, was plaintiff's direct supervisor from 1991 to 1995 and from December 1997 to October 1998. Defendant Katherine Bainer, a "Team Leader" at Wassaic, was plaintiff's second-level supervisor in 1991–92 and from March 1998 to July 2000. Defendant David Sucato was the Director of the Taconic DDSO from July 1997 to October 2000.

*Kennedy Hall, 1991–1995*

The Taconic DDSO consists of residential buildings on the Wassaic campus and residential houses in the surrounding communities. The residents of both are called "consumers." Plaintiff, one of few black supervisors at Wassaic, initially was placed at a building named Kennedy Hall.

According to Hill, while at Kennedy Hall, McNeil treated her (and another black DA II, Leomie Hudson) differently than he treated white supervisors. He allegedly allowed white subordinates to be insubordinate to Hill and Hudson without taking action—but took disciplinary action against staff members who were insubordinate or hostile toward white supervisors.

On one occasion, Hill found herself in an argument with a subordinate, Brenda Palmer. After the argument, Palmer allegedly said to a co-worker that Hill could "kiss my lily white ass." (McNeil Dep. at 53.) Hill filed a complaint about Palmer with McNeil. McNeil told her that "since you didn't hear [Palmer] say that there is nothing that can be done." (Hill. Dep. at 50.) In response, McNeil took Palmer aside and verbally counseled her that such remarks were inappropriate and unacceptable, especially to a DA II (McNeil Aff. ¶ 9.) McNeil did not refer Palmer for discipline and did not place a counseling memorandum in her personnel file. (McNeil Dep. 52–54.) He felt that the November 14, 2001 verbal counseling was sufficient since Palmer had just had an argument with the plaintiff. (McNeil Aff. ¶ 9.)

Plaintiff also complained that George Martin, a white employee, was allowed to leave his evening shift early. McNeil states that he granted him this accommodation because his wife also worked at Taconic DDSO and their second automobile needed repairs. Allowing Martin to leave early meant that his wife could have the car to get to her shift on time. This situation lasted for a week and a half until the automobile was fixed. McNeil claims that he allowed Hawley Wellman, an African–American employee, a similar accommodation when he had a car repair problem. (McNeil Aff. ¶ 19.)

In or about 1993, another black supervisor at Wassaic, Leomie Hudson, circulated a petition protesting discriminatory treatment of black employees and supervisors. Hill and approximately twenty others signed the petition and presented it to the then-director of Taconic DDSO, Hollis Shaw.

Director Shaw, who is black, did an investigation of the complaints and decided there were insufficient grounds to discipline McNeil. One of the issues raised in the investigation was whether McNeil applied a different standard for blacks and whites in reviewing Time & Attendance ("T & A") sheets. Shaw concluded that

McNeil was more lenient with respect to two particular employees because he knew they had certain health problems. Shaw gave McNeil a written counseling and was told that he could not make such exceptions because of the appearance of unfairness. (McNeill Aff. ¶ 12.)

In 1994, Shaw instituted a two-day "Diversity Training" for all employees. Plaintiff contends that McNeil's allegedly discriminatory conduct continued despite the Diversity Training. She charges that in or about 1994, Hudson's white colleague George Valdick, reported to Hudson that he had heard McNeil say, "I'm sick of these niggers. They are getting on my nerves." (Hudson Aff. ¶ 12.)[1] At Hudson's request, Valdick put his statement in writing, and gave it to Mary Parker, Taconic DDSO's former Affirmative Action officer. However, Hudson heard no response from Parker or anyone else at Taconic DDSO about McNeil's remarks. McNeil was told he was being investigated, but was never asked about his remark. (McNeil Dep. at 32).

In February, 1994, Hill received one written counseling memorandum, which she claims was in response to her signing a petition protesting discriminatory treat-

---

1. McNeil's alleged 1994 statement that was heard by George Valdick ("I'm sick of these niggers. They are getting on my nerves"), and is reported by Hudson in her affidavit (Hudson Aff. at ¶ 12), is inadmissible hearsay. Rule 56(e) of the Federal Rules of Civil Procedure requires that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." See Cronin v. Aetna Life Insure. Co., 46 F.3d 196, 203 (2d Cir.1995) (stating that court must "determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive"). Plaintiff offers

McNeil's alleged statement as it was heard by Valdick and reported to Hudson. Any testimony by Hudson as to what McNeil may have said to Valdick is inadmissible hearsay.

This Court will, however, consider this statement in evaluating plaintiff's hostile environment claim. See Schwapp v. Avon, 118 F.3d 106, 110 (2d Cir.1997) (concluding that "[i]n a hostile environment case, the mere fact that [plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim.... The fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can also impact the work environment.").

ment of African Americans. (Howard Aff., Ex. F; Hill Aff. ¶ 6.) In January 1995, Kennedy Hall was closed as part of deinstitutionalization, and plaintiff and McNeil were reassigned to different buildings.

*Mohawk Hall 1997–1999*

In March 1997, Hill was assigned as the evening shift DA II in Wassaic's Mohawk building. The Mohawk Building was considered a difficult assignment because it housed forty-five "consumers," all of whom were multiply diagnosed with psychiatric disorders and mild retardation. All had aggressive tendencies, and they frequently hurled insults and racial slurs at staff members. In December 1997, McNeil also was transferred to Mohawk as a DA III, and again became Hill's direct supervisor.

McNeil unsuccessfully sought a different assignment because of the poor working relationship he had with plaintiff at Kennedy. According to McNeil, he and plaintiff had very different management styles. He believed that she wanted a rigid set of rules that could be applied in all situations, but did not appreciate that the methods of proceeding with volatile consumers were constantly evolving. (McNeil Aff. at ¶ 8.) Plaintiff contends their problems were due to the fact that she was African–American. (Hill Aff. ¶¶ 5–6, 9–11, 17, 20–24.)

In or about March 1998, Bainer became Team Leader, and Hill's second-level supervisor, at Mohawk. In October 1998, at his own request, McNeil made a lateral move from Mohawk to a unit devoted to Sexual Relapse and Anger Management. The permanent position of DA III at Mohawk went to Lionel "LJ" Vincent.

In September 1999, Mohawk closed and the consumers and staff moved to "new" Jacobi, another residential building on campus. Bainer remained at Jacobi until her retirement in July 2000. Defendant Sucato was Director of Taconic DDSO from July 31, 1997 until October 2000, when he retired.

Plaintiff claims that her supervisors did not support her (but supported white supervisors) when she had conflicts with consumers and subordinates; that some of her critical supervisory duties were delegated to a white supervisor; and that she was retaliated against for complaining about racial discrimination to the EEOC.

A. Incidents With Subordinates and Consumers

1. *Matolla Incident*

In the spring of 1998, in the presence of clients and other staff at Mohawk, one of Hill's white subordinates, Joseph Matolla, raised his voice when Hill would not let him go home until the overnight shift relieved him. To avoid disrupting the unit, Hill met with Matolla in the main office. While Hill attempted to calm him, he screamed at Hill and stormed out of the office. Overhearing the incident, the building nurse told Hill that he would be a witness if disciplinary charges were brought against Matolla. (Hill Aff. ¶ 9.)

Hill told McNeil about the incident and identified the nurse as a witness. Mattola also filed a complaint against Hill for harassment. In response, McNeil talked to Matolla and Hill, but did not take further action. (McNeil Dep. at 58–61.) According to McNeil, he decided not to refer Mattola (or Hill) for disciplinary action. He simply told Mattola, "You can't conduct yourself that way." (*Id.*) After the disagreement between Hill and Matolla, Bainer wrote two memoranda clarifying the overtime policy. (Bainer Aff. at ¶ 13)

After the screaming incident, Matolla allegedly told James Santoro, a consumer, that Hill had upset him and caused him to miss work because of high blood pressure. Santoro regularly referred to Hill as "nig-

ger" and told her to "Go Back to Africa." (Hill Aff. at ¶ 10.) Hill told Matolla's day-shift supervisor that it was inappropriate for Matolla to discuss the incident with a client. (Hill Aff. ¶ 10). Mattola later was promoted to a supervisory position. (*Id.*)

## 2. *Conahan Incident*

There are two incidents when plaintiff complained about Bernadette Conahan. On one occasion, Hill wrote up Conahan for walking off of the job after she had a conflict with a co-worker. (Hill dep. at 23.) The other report was for refusing a direct order to distribute pizza to the consumers. (Hill Dep. at 81–82). Hill contends that she repeatedly brought Conahan's insubordinate conduct to the attention of her supervisors. Plaintiff does not remember who was the team leader to whom she directed her report. (*Id.* at 82.) However, no one took any corrective action or otherwise intervened.

## 3. *McNeil Incident*

Plaintiff alleges that contrary to his treatment of white supervisors, McNeil was verbally disrespectful and rude toward plaintiff. (Hill Aff. ¶ 21). For example, during a September 1998 meeting in the main office attended by McNeil, Hill and Osborne, Hill sought clarification about the evening shift overtime policy. Hill claims that McNeil yelled at her, ordering her out of the office. She claims that he did not engage in such abusive conduct toward other supervisors. (Hill Dep. at 35–40.) McNeil responds that the incident was an inappropriate discussion of a personal matter in front of other employees and consumers. (McNeil Aff. at ¶ 20.) Plaintiff never heard McNeil make any derogatory statements about blacks. *Id.* at 40.

## 4. *Bronk Incident*

On one occasion (after Vincent had replaced McNeil as the DA III at Mohawk), Susan Bronk was observing a violent consumer. When Bronk was relieved for dinner, the consumer began to act out by throwing furniture around. Because no one was around, plaintiff thought it prudent to let her "ventilate." When Bronk returned, she immediately restrained the woman, even though Hill told her three times to back off. Plaintiff complained to Vincent, asking him to reinforce her order that Bronk cease to restrain the consumer, but Vincent did not respond. (Hill Dep. at 88–91 and 110–113.)

On another occasion, in the summer or fall of 2000, Bronk volunteered to take four consumers to the swimming pool. In so doing, she left one of them wandering around the hallway. Plaintiff spotted the remaining consumer, and took her over to the swimming pool herself. Bronk acted like she did not know the consumer was missing. (Hill Dep. at 92.) Plaintiff wrote up the incident, but Bronk allegedly "never missed a day" as a result of discipline. (*Id.* at 93.)

## 5. *Milton Incident*

Plaintiff testified to an "ongoing conflict" with Debra Milton, a black subordinate. (Hill Dep. at 83.) Plaintiff gave Milton assignments, and Milton regularly would call one of plaintiff's supervisors to complain.

On one occasion, one consumer assaulted another on Milton's watch (while plaintiff was the building charge). Milton did not call plaintiff, and instructed personnel to clean up all of the blood in the area. According to plaintiff, cleaning blood after an assault (but before an investigation) is against procedure. During the clean-up, plaintiff's supervisor LJ Vincent was on the scene. When plaintiff protested that Milton had not followed procedures, he told her that there was no violation of

procedures because there was no allegation of abuse, what had happened was known, and that consumers would otherwise track the blood all over the building. (Jones Aff. Ex. H.) Plaintiff contends that her authority to teach proper procedures was undermined by variations being allowed. (Hill Dep. at 83–86.)

### 6. Bradshaw Incident

On one occasion, Plaintiff determined that Glenn Bradshaw, an African–American trainee, submitted a note to her that was a reproduction of an old doctor's note with an altered date. When Bradshaw called in sick a week later, plaintiff required him to submit an original note and he refused. (Hill Dep. at 94–97.) Bradshaw was issued a notice of termination, but his termination was rescinded by the Affirmative Action Administrator Essie Greene, an African–American. (*Id.*)

### 7. Tuck Incident

In April 1999, Hill observed a white DA trainee named Gene Tuck improperly handle a patient by leaving him unattended. When Hill tried to instruct him, he become belligerent and said, "You people don't make any fucking sense!" (Watkins Aff. 6, Ex. 5.) Hill tried to explain that no one expected Tuck to do everything, but that monitoring the client should be his first priority. Tuck walked away and yelled, "Stop yelling in my fucking face!" (*Id.*) Hill said she wasn't yelling, but needed to ensure that Tuck understood his duties. (*Id.*) When Hill left the room and closed the door behind her, Tuck yelled, "Don't slam the fucking door!" (*Id.*)

Hill wrote a memorandum about the incident to her direct supervisor, Lionel Vincent, subject: "G.Tuck/Failure to Monitor V. Genise/Verbal Abuse." Vincent took no action against Tuck for his conduct. (Hill Aff. ¶ 12.)

### 8. Woelfel Incident

On November 1, 1999, with staff and clients present, Dean Woelfel, a white subordinate, asked Hill to reassign the staff on his unit. (Hill Aff. 13; Watkins Aff. 7, Ex. 6.) When she refused, Woelfel called her a "fucking pain in the ass" and shouted other profanities at her. Woelfel demanded that she explain her refusal to change the schedule, but Hill said she would not continue the discussion. When Hill turned to walk away, Woelfel punched the wall next to her head. (*Id.*) Later in the day, in the presence of Vincent (Hill's supervisor), Woelfel again became verbally abusive over the issue of scheduling, and asked Vincent to overrule her decision, which he called a "no-brainer." (Watkins Aff. at Ex. 6.)

Hill immediately wrote an incident report and sent it to Vincent, subject: "Incident on 11–1–99 Re: DA Dean Woelfel." She also reported Woelfel's acts to Bainer, and to the Affirmative Action officer. The Affirmative Action officer told her that they could not punish Woelfel because that might interfere with his free speech rights. (Hill Aff. ¶ 15.) Woelfel allegedly continued to act abusively toward Hill, ignoring her directives, telling her to "get out of my face" and accusing her of harassment whenever she gave him a simple directive.

Defendants respond that Bainer made an initial investigation of the situation and then referred the matter to personnel for disciplinary action. She did not have the authority to issue a Notice of Discipline ("NOD") because she was a Treatment Team Leader ("TTL"). (Bainer Aff. at ¶ 8.) Lea Howard, the Associate Personnel Administrator at TDDSO also states that Bainer referred this incident to her office for disciplinary action. A NOD was issued to Woelfel on January 18, 2000, recommending the penalty of termination.

(Howard Aff. ¶ 8; Exh. A to Howard Aff.) Woelfel then grieved the NOD and a hearing was scheduled for March 28, 2000. (Howard Aff. ¶ 10.) At that time, a Union Advocate informed the OHRM that Woelfel was out on extended medical leave and could not attend the hearing. (Howard Aff. ¶ 11.) Woelfel's attendance sheets are included in Howard's affidavit, showing that he was on sick leave more often than he worked during this time period, making it difficult to re-schedule the hearing. (Howard Aff. ¶¶ 12–13.) The hearing was held on December 12, 2000. (Howard Aff. ¶ 14.) Woelfel decided to proceed with arbitration of the matter on January 18, 2001, and worked only four days after that. (Howard Aff. ¶ 15.) He settled on March 30, 2001. (Howard Aff. ¶ 17.)

Plaintiff acknowledges that Woelfel received a NOD for his behavior with her on November 1, 1999 but asserts that she should not have had to supervise him after the incident. (Counterstatement No. 62.) However, Plaintiff does not assert that she asked management to remove him from her supervision.

### 9. *Bonnell Incident*

Plaintiff also complained to Bainer that she believed that staff members were teaching "consumer" Debra Bonnell to direct racial slurs at the black staff. Bonnell allegedly referred to Hill as "nigger," and told her to "Go back to Africa." (Hill Aff. ¶ 19.) According to Bainer, Bonnell had animosity toward many staff members—black and white—including plaintiff. She once called a white staff member a "black bastard."

In January 1999, Bonnell attacked a Mohawk staff member without provocation, and was punished for it. Bonnell blamed Hill for the punishment. As a result, Bainer conducted a meeting with Bonnell, plaintiff, Lee Corwin, and LJ Vincent. At the meeting, Bonnell apologized for telling Hill to "Go back to Africa where you belong," and Bonnell shook plaintiff's hand and hugged her. (Bainer Aff. at Ex. A.) The very next day, Bonnell attacked plaintiff, causing her injuries, and forcing her to take time off to recover. (*Id.*)

In April 1999, Bonnell tape-recorded an hour of activities at her unit, and told Hill that she was going to be fired because of the taping that she was doing. Bainer initially allowed Bonnell to tape record in her unit because she "thought it might make Bonnell feel more secure and in control if she could tape," (Bainer Aff. at 20.). Bainer checked with the personnel office to find out if this was permissible, and the office told her that she could not prevent the taping. After receiving complaints, the administration concluded that the taping violated the rights of other clients and staff, and the taping was stopped. (Bainer Dep. at 59–60.)

Plaintiff cites two instances in which subordinates of white supervisors were punished. Employee Philip Payme was written up by McNeil for talking to a white supervisor in a raised tone of voice. (Hill Dep. at 73.). After McNeil had left, another employee, Steve Reynolds was put on administrative leave because he did not get off the telephone when he was told to by white supervisor Bruce LeMay. (*Id.* at 75.)

### B. Delegation of Plaintiff's Duties

At her deposition, plaintiff claimed that McNeil took the responsibility of preparing evening shift assignments away from the evening shift building charge, and gave it to the white day shift supervisor. (Hill Dep. At 28–31.) At the time McNeil took the responsibility away, Gary Stoddard—not plaintiff—held the position of evening shift building charge. In her affidavit, plaintiff contradicts her deposition testimo-

ny and claims that McNeil gave *her* evening shift scheduling responsibilities to white day-shift supervisor Tara Osborne.

Defendants assert that a night shift DA II had previously prepared the assignment sheets for the Mohawk building because that shift was the quietest, and that DA II had the most time to complete the task. The DA II retired, however, and was not replaced. Bainer and McNeil then conferred about which shift would prepare the assignments, and decided that the building charge on the evening shift, Gary Stoddard, would not be able to complete this assignment given the changed circumstances. Hence, a day shift DA II was given the task of preparing all of the sheets. (McNeil Aff. ¶ 17.)

She claims that McNeil also allegedly allowed white supervisors to give input into making changes on their units (including room assignments, client activities, assigning field trips, etc.) while neither Hill nor Hudson was allowed to give such input. (Hudson Aff. ¶ 4.) Bainer and McNeil respond by saying that they had the ultimate responsibility to determine room assignments. They sought suggestions from all shift supervisors—but that plaintiff's real complaint is that they did not always follow her suggestions. (Jones Aff. ¶ 17.)

On another occasion, plaintiff was assigned to do a "close observation" of a consumer. She crossed off the assignment and gave it to a subordinate, a DA I. Defendant Bainer ordered that plaintiff do the assignment. Plaintiff testifies that it is not customary to assign DA II's to perform close observations. (Hill Dep. at 102–03.) Defendants respond that close observations are part of a supervisor's job description, and they put forth examples of other supervisors who have performed close observations. (Bainer Aff. at ¶ 12.) Dan Atkins, a white DA II on the night shift, performed more close observations

than plaintiff. Dan McNeil (a white DA III) and Bainer (a TTL) performed them, as well. (Bainer Aff. at ¶ 12.)

## C. Complaints of Race Discrimination

In or about May 1998, plaintiff filed an internal complaint with Taconic DDSO's Affirmative Action office based on, *inter alia*, McNeil's disparate treatment. (Hill Aff. ¶ 21.; Watkins Aff. at Ex. 13.) Taconic DDSO took no action on Hill's complaint, and plaintiff wrote to David Sucato, Director of the Taconic DDSO, in a letter stamped "received" on June 13, 1999. The letter stated, in part:

> "As you know, several months ago I filed complaints of racial discrimination and harassment with affirmative action. As of this date I have not heard one word from affirmative action as to the status of my complaints, and there has been no improvement in the oppressive working conditions. While no actions have been taken against those individuals who have abused their powers, I have been removed from Mohawk MDU and assigned to Jacobi Hall. This is another act of retaliation.... I am not intimidated. I am more determined than ever to seek justice in a court of law."

(Watkins Aff. at Ex. 11.)

According to McNeil, in May or June 1998, he and Tara Osborne requested a meeting with Sucato to discuss racial tensions at Mohawk, and to address rumors that were circulating about an investigation of the treatment of black employees at the facility. Sucato confirmed the existence of an investigation that was being conducted by the "central office or Albany." (McNeil Dep. at 23.) It was at this point that McNeil became aware of Hill's complaint. (*Id.* at 16–17.) Plaintiff claims that after she filed the internal complaint,

McNeil treated her "with open hostility." (Hill Aff. ¶ 21.)

In August 1998, Hill also filed an EEOC complaint of race discrimination and retaliation against Taconic DDSO. In her complaint, Hill stated:

"I have been continually undermined, harassed, and treated in a disrespectful and humiliating manner by my supervisor William "Dan" McNeil, despite the fact that I have performed my duties competently. By his actions and example, Mr. McNeil has encouraged and tolerated resistance to my supervision and harassment by my subordinates. These actions have created a hostile working environment for me and an unsafe and nontherapeutic environment for the consumers in my bldg."

(Watkins Aff. at Ex. 10.)

On September 23, 1999, the EEOC issued a Determination that Taconic DDSO "engaged in employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to the disparate treatment of Charging Party based on race." (Watkins Aff. at Ex. 12.) Taconic DDSO did not respond to Hill's allegations before the EEOC. The Commission concluded that the respondent's silence was an admission, and drew all adverse inferences. (*Id.* at Ex. 12.) After efforts at conciliation failed, the EEOC issued Hill a right to sue letter.

### 8. Retaliation Against Plaintiff

In January 2000, four months after the EEOC issued its determination, plaintiff was brought up on disciplinary charges for the first time in her career. (Hill Aff. ¶ 26). The charges stemmed from an incident on January 9, 2000 in which plaintiff had inappropriately assigned three inexperienced staff to a unit without an experienced staff member, and then had neglected to tell them that one of the consumers in that unit must be kept on close observation. A consumer was injured on that shift. (Banier Aff. ¶ 11.) Plaintiff admitted that she made the assignments and forgot to tell the staff about the necessity of a close observation. (Hill Dep. at 25–26.)[2] Bainer initiated the charges and Sucato then proffered them against plaintiff.

On March 9, 2000 plaintiff was notified by Sucato of charges of misconduct/incompetence that were made against her. The notice stated: "CHARGE 1: On January 9, 2000, in Jacobi Hall, you assigned three non-Jacobi staff to Unit 7, and did not pair them with a veteran Jacobi staff. CHARGE 2: On January 9, 2000, in Jacobi Hall, you were negligent of your supervisory duties when you failed to notify three staff you assigned to unit 7 of a Close Observation Order for Consumer T.S." As a result of these charges, Sucato suspended plaintiff without pay for two

---

**2.** When an incident occurs at the Taconic DDSO that a supervisor considers inappropriate, the incident is reported up the chain of command to the Treatment Team Leader ("TTL"), who is responsible for running the Team. The TTL then conducts an investigation and if he concludes that the incident may require disciplinary action, the incident is referred to the personnel office, which has the power to issue a Notice of Discipline ("NOD"). (Howard Aff. ¶ 5.)

The personnel office then conducts an investigation and interrogation. A summary report is then generated and the entire case presented to the Discipline Review Panel ("DRP") for their review. The DRP consists of the Deputy Director, Affirmative Action Officer, and Quality Assurance Director. Once the DRP signs off on a case, it is reviewed by a representative from the OMRDD's office of Employee Relations. The case is then presented to the DDSO Director who approves or disapproves service of the NOD. If approved, a NOD is then issued to the staff member. (*Id.* ¶ 6.)

weeks. Plaintiff was charged with violating a policy concerning the assignment of staff from other buildings during a staff shortage. (Hill.Aff.¶ 26.) Plaintiff acknowledges that she did assign trainees to the unit, but asserts that there was no written policy against putting inexperienced staff into the Jacobi unit. (Hill Dep. at 26–26; Hill Aff. at ¶ 26.) Bainer explains that there was no written policy until after the incident, but that plaintiff's actions violated standard operating procedure.

On November 7, 2000, plaintiff received a "Formal Counselling [sic] on Time and Attendance" memorandum, in which Vincent noted six unscheduled absences since August 2, 2000 (the date on which she had been verbally counseled about problems with absence). She was advised that her attendance and time would be monitored monthly, and could be referred to personnel for further disciplinary action. (Howard Aff., Ex. G.)

Plaintiff's claim of racial discrimination in the terms and conditions of employment is based on the allegation that defendants "subjected her to less favorable treatment than white supervisors at her grade level." (Compl.¶ 18.) To support this claim, she alleges that she was denied support by her superiors in disciplining subordinates; subjected to abusive conduct by subordinates which—unlike situations involving white supervisors—went unaddressed by her superiors; and was made to perform duties customarily assigned to non-supervisory staff.

Defendants respond that any allegations of wrongdoing while plaintiff was at Kennedy Hall are now time-barred; and that plaintiff does not have a claim for race discrimination under Title VII because: (1) there was no adverse employment action taken; (2) there was no racial basis for the incidents; and (3) the alleged retaliatory acts were not in response to plaintiff's filing an EEOC complaint. They also argue that the claims under §§ 1981 and 1983 against Taconic DDSO and the individual defendants in their official capacities are barred by the Eleventh Amendment; that the claims against the individual defendants in their personal capacities should fail because there is no evidence of racial animus; that the individual defendants are entitled to qualified immunity; and that the claims brought under section 296 of the HRL are barred by the Eleventh Amendment.

For the reasons stated below, defendants' motion for summary judgment is granted in part and denied in part.

## DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505.

Because Hill alleges discriminatory treatment in violation of Title VII, the

Court applies the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas*, the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). Under this framework, plaintiff first must establish a prima facie case of discrimination. To establish a prima facie case, plaintiff must show that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) she was performing her duties satisfactorily; and (4) the circumstances surrounding the employment action give rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. 1817. Plaintiff's burden of establishing a prima facie case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 506, 113 S.Ct. 2742; *Fisher v. Vassar College*, 114 F.3d 1332, 1340 n. 7 (2d Cir.) (en banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). If plaintiff succeeds, a presumption of discrimination arises.

Once a plaintiff proves the prima facie case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden of production then shifts to the employer "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir.) (en banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). The employer's explanation must be clear and specific, so that the employee has an opportunity to demonstrate pretext. *See Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985).

Should the defendant carry this burden, the plaintiff must then demonstrate that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802, 804, 93 S.Ct. 1817). To satisfy this burden, the plaintiff must show that: (1) the proffered reason is false; and (2) that discrimination was the real motive for the employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. at 515, 113 S.Ct. 2742; *Gallo v. Prudential Residential Svcs. Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994). While the burden of production may shift, the burden of proving discriminatory intent remains always with the plaintiff. *See id.* at 253, 101 S.Ct. 1089, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207; *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742.

### 1. Claims Related to Incidents at Kennedy Hall Are Time–Barred

 In order to pursue a Title VII claim in federal court, a plaintiff must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Butts v. City of N.Y. Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993). The statute of limitations for filing a charge of discrimination with the EEOC is 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. 200e–5(e)(1); *see also Butts*, 990 F.2d at 1401. Failure to comply with this timing requirement will cause a claim to be time-barred. *Butts*, 990 F.2d at 1401; *Carrasco v. N.Y. City Off–Track Betting Corp.*, 858 F.Supp. 28, 30 (S.D.N.Y.1994).

 The limitations period, however, is not jurisdictional and may be tolled in certain situations. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct.

1127, 1135, 71 L.Ed.2d 234 (1982). For example, a continuing policy of discrimination will prevent a claim from being time-barred. *See, e.g., Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Indeed, the limitations period may be tolled "when equity so requires." *Zipes,* 455 U.S. at 398, 102 S.Ct. 1127.

■ Plaintiff worked at Kennedy from June 1991 until Kennedy closed in January 1995. Plaintiff first filed her Charge of Discrimination with the EEOC on August 19, 1998. Accordingly, only those acts or statements occurring on or after October 23, 1997—which is 300 days prior to the filing—are timely.

Plaintiff refers to two statements made while she was at Kennedy in support of her complaint. The first was the remark by Brenda Palmer to a co-worker that plaintiff "can kiss my lily-white ass." The second was the alleged statement by McNeil that "I'm sick of these niggers. They are getting on my nerves." Neither statement may form the basis of a complaint against defendants, because they are barred by the time requirements of the EEOC. I see no reason to toll the statute of limitations in this case, as there was no "continuing violation." The allegations of Title VII violations took place at Kennedy Hall from 1991–1995, and at Mohawk Hall from 1997–1998. There was no continuity in plaintiff's contact with defendants McNeil and Bainer. Sucato was the director of Taconic DDSO only after 1997. Plaintiff makes no allegation of race discrimination from 1995–1997.

## 2. Claims Based on Incidents Occurring While at Mohawk

### a. *Disparate Treatment in Terms and Conditions of Hill's Employment*

■ In cases alleging on-the-job discrimination, the plaintiff may establish a prima facie case by showing the following elements: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment decision; and (4) that the decision took place under circumstances giving rise to an inference of discrimination. *See Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998). The burden of establishing a prima facie case of discrimination is not an onerous one. *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742; *Fisher v. Vassar College,* 114 F.3d at 1335, 1340 & n. 7; *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64, 65 (2d Cir.1995). In this case, plaintiff has established a prima facie case of discrimination.

Plaintiff satisfies the first two prongs of the prima facie test. An African–American, she is a member of a protected group. She has also put forth evidence to meet the second requirement, satisfactory job performance.

■ Plaintiff has met the third prong of this test, as well. Plaintiff contends that she was issued a NOD resulting in a suspension. This allegation is an adverse employment action in the form of a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (citing *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999)). In order to be "materially adverse," the change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). Examples of materially adverse changes include negative evaluation letters, termination, demotion, a less distinguished title, loss of benefits, and significantly diminished material responsibilities. *Id.; Morris v. Lindau,* 196 F.3d

102, 110 (2d Cir.1999) (noting that adverse actions may include "negative evaluation letters"); *Preda v. Nissho Iwai American Corp.*, 128 F.3d 789 (2d Cir.1997) (exclusion from department meetings and client outings); *de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 82 F.3d 16 (2d Cir.1996) (transfer to a less prestigious unit with little opportunity for professional growth); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426 (2d Cir.1999) (transfer to a different facility and less desirable job); *Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998) (finding that "allegations of denial of overtime pay and additional staffing were sufficient to meet element of prima facie case of disparate treatment"). Plaintiff has met her burden of putting forth evidence to show that the terms of conditions of her employment were altered by the suspension she was given.

■■■■■ Plaintiff has also presented facts sufficient to support the last element of the prima facie case—those leading to a permissible inference of discriminatory intent. Plaintiff alleges more favorable treatment of supervisors not in the protected group. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994) (citing *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir.1993) (where black worker was the only person to lose her job in a supposed reduction in force)). To prevail on this type of equal protection claim, plaintiff must show that she was treated differently in comparison with other parties similarly situated, and that there was no rational basis for that disparate treatment. *See, e.g., Sag Harbor Port Assoc. v. Village of Sag Harbor*, 21 F.Supp.2d 179, 185 (E.D.N.Y.1998) (citing *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). In this case, there is an issue of fact over whether similarly situated white supervisors were treated differently than plaintiff was.

■■■■■ Ordinarily, whether employees are similarly situated is a question of fact for the jury. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). Plaintiff must put forth evidence to demonstrate that she and the comparable employees were similarly situated "in all material respects." *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir.1997) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992)). The Second Circuit explained this standard in *Graham v. Long Island R.R.*, stating that plaintiff must demonstrate "comparable seriousness" of the conduct. 230 F.3d at 40. The Court recognized that the plaintiff and other employees do not have to be similarly situated in every single aspect of their employment, but that there must a reasonably close resemblance of the facts and circumstances. *Id.*

In this case, plaintiff makes several assertions of disparate treatment. She claims that defendants routinely ignored, and even condoned, insubordination by white staff and clients against Hill and other black supervisors. Plaintiff alleges that, in contrast, defendants reprimanded staff who were insubordinate to white supervisors.

Hill's affidavit claims that: "Mr. McNeill repeatedly allowed white subordinates to ignore directives given by Leomie Hudson and me" (Hill Aff. ¶ 5); "I also believe, based on McNeill's hostile attitude toward me, that he was resentful that I had complained of discrimination" (*Id.* ¶ 6.); "As in Kennedy Hall, certain white subordinates were routinely hostile and insubordinate toward me, and, though informed of the situation, McNeill and Bainer refused to take any corrective action or to support me as a supervisor" (*Id.* ¶ 8.); "In addition to Mr. Matolla, other staff members at Mo-

hawk refused to take basic direction from me, including Sue Bronk and Bernadette Conahan. I repeatedly brought their insubordinate conduct to the attention of McNeill and Bainer. However, they did not take any corrective action or otherwise intervene" (*Id.* ¶ 11.); "I believe, based on my experiences, that certain staff members at Mohawk, including Mattola, Woelfel and Bronk encouraged openly racist consumers to act out toward me." (*Id.* ¶ 18.)

Plaintiff cites two specific examples in which McNeil and his successor disciplined an employee for being insubordinate to a white supervisor. According to Hill, employee Philip Payme was written up by McNeil for talking to a white supervisor in a raised tone of voice. (Hill Dep. at 73.) After McNeil had left, another employee, Steve Reynolds was put on administrative leave because he did not get off the telephone when he was told to by white supervisor Bruce LeMay. (*Id.* at 75.) Plaintiff cites the Mattolla, Conahan, McNeil, Bronk, Milton, Bradshaw, Tuck, and Woelfel incidents as times where employees were not disciplined for insubordination against a black supervisor.

There is a genuine issue of fact about whether similarly situated white supervisors were treated differently than she was.

■ Therefore, the burden of production shifts to the employer to put forth a legitimate, nondiscriminatory reason for the presumed unlawful discrimination. Defendants contend that employees that were insubordinate to black supervisors were reprimanded. However, Plaintiff has put forth evidence that raises an issue of fact over whether the employees were reprimanded in the same way (e.g. as harshly) as those who were insubordinate to white supervisors. Hence, Plaintiff's claim of disparate treatment in the terms and con-

ditions of her employment is sufficient to withstand summary judgment.

### b. Hostile Work Environment

■ In order to prevail on a claim of hostile-work-environment, a plaintiff must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment" and create an environment that a reasonable person would find hostile or abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted); *see, e.g., Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2d Cir.1993). Title VII does not authorize a hostile work environment claim for conduct that was merely offensive. *See, e.g., Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. 2399 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII").

■ It is clear in this case that plaintiff subjectively believed that her workplace was a hostile one. Hence, the question is whether plaintiff has put forth sufficient evidence to show that the environment was objectively hostile. That is, would a reasonable person who is the target of discrimination find that the working conditions are so severe or pervasive as to alter the terms and conditions of employment. *Richardson*, 180 F.3d at 436; *see also Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.1997) (noting that the standards for evaluating hostile environment claims are the same whether the discrimination is based on sex or race). Factors in this determination include: (1) the frequency of

the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance;" (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted. *Harris v. Forklift Systems*, 510 U.S. at 21, 114 S.Ct. 367.

 The work environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Torres*, 116 F.3d at 630–31 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21, 114 S.Ct. 367). Plaintiff must show that the working environment "actually constituted discrimina[tion] . . . because of . . . [race]." *Ricks v. Conde Nast Publications, Inc.*, No.00–7679, 2001 WL 273835, at *3 (2d Cir. Mar.20, 2001) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)) (alteration in original; citation omitted). "[E]ven a single episode of harassment, if severe enough, can establish a hostile work environment." *Torres*, 116 F.3d at 631, n. 4

 As the Second Circuit has cautioned, the existence of a hostile work environment is a "mixed question of law and fact." *Richardson*, 180 F.3d at 436 (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 737 (2d Cir.1983)). These kinds of questions are "especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Id.* (quoting *Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir.1990)).

 Plaintiff contends that she was subject to a hostile work environment because she did not receive support from her white supervisors when she had conflicts with consumers and subordinates. As a result, her position as a supervisor was denigrated, and she was less able to do her job. She also points to two incidents—one in which her scheduling duties were delegated to a white supervisor, and another in which she was assigned to do a "close observation" of a consumer—to demonstrate that she suffered from discriminatory treatment. While it is a close question, I conclude that these allegations suffice to raise an issue of fact over whether plaintiff was subject to a discriminatory hostile work environment.

### c. Retaliation

 In order to prevail on a claim of retaliation, plaintiff must show that (1) the employee was engaged in an activity protected by Title VII; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir.2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996)).

 Plaintiff complained to her employer and to the EEOC of racial discrimination. In May 1998, she filed a written complaint with her employer. In August 1998, she filed an EEOC complaint. These complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (holding that protected activity under Title VII includes, inter alia, "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.").

 Plaintiff is correct that the NOD that was issued against her (resulting in a

suspension) was an adverse employment action. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (noting, for example, that adverse actions may include "negative evaluation letters"). However, plaintiff cannot show any causal connection between the notice of discipline and her EEOC charge. She filed her EEOC complaint in August 1998, and was not disciplined for almost one and a half years. Plaintiff's argument that the discipline occurred only four months after the EEOC sustained her discrimination charge, is of no avail. The U.S. Supreme Court, in its recently decided case, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), sustained dismissal of a Title VII retaliation claim where plaintiff was transferred twenty months after she filed an EEOC charge, but only three months after her right-to-sue letter issued. The Supreme Court reasoned that, since the issuance of the right-to-sue letter is not protected activity, the twenty month gap between the EEOC charge and the transfer did not establish causation. *Id.*

There is no evidence that defendants were motivated to issue the NOD because of her EEOC charge, and the lengthy period that passed between the one and the other negates any such inference. *See Manoharan v. Columbia Univ. Col. of Phys. & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988) (a lapse of eighteen months does not closely follow a protected act).

Because plaintiff cannot adduce facts to demonstrate that there was a causal connection between her protected activity and the discipline, her retaliation claim fails.

### 3. 1981 and 1983 Claims Against Taconic DDSO and Individual Defendants

#### a. Claims Against Taconic DDSO

■ The Eleventh Amendment bars suits against the State of New York and its agencies or entities, in the absence of the State's unequivocal waiver of its immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 97–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). OMRDD is a New York State agency. N.Y. Mental Hyg. Law § 13.01. The Taconic DDSO is a facility operated by OMRDD. *Id.* § 13.17(b).

■ It is well-settled that § 1981 and § 1983 do not override the Eleventh Amendment immunity afforded states, state agencies, and state officials. *See, e.g., Will*, 491 U.S at 58, 109 S.Ct. 2304; *Quern v. Jordan*, 440 U.S. 332, 343, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). *See also Yoonessi v. State Univ. of New York*, 56 F.3d 10, 12 (2d Cir.), *cert. denied*, 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 730 (1996) (affirming dismissal of 1981 claim on Eleventh Amendment grounds); *Allen v. Cuomo*, 100 F.3d 253, 260–61 (2d Cir.1996) (affirming dismissal of 1983 claim on Eleventh Amendment grounds). Accordingly, plaintiff's § 1981 and § 1983 claims against Taconic DDSO and the defendants in their official capacity are dismissed.

#### b. Claims Against Sucato, McNeil and Bainer in their Personal Capacities

■ To state a claim against the individual defendants in their personal capacity, plaintiff must demonstrate that defendants possessed "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

■ Plaintiff has alleged specific evidence from which a jury could find that Sucato, McNeil and Bainer possessed in-

vidiously discriminatory animus. Since the jury may credit plaintiff's version of events and conclude that disciplinary charges against Hill were retaliatory, "good faith" qualified immunity cannot attach. *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996). Therefore, plaintiff's claims against Sucato, McNeil and Bainer in their individual capacities survive summary judgment.

**4. State Claims Against Taconic DDSO and Individual Defendants under HRL 296.**

*a. Claims Against Taconic DDSO*

 Taconic DDSO is a state agency for purposes of the Eleventh Amendment. It is well-settled that New York State and its agencies are immune from suit under N.Y. Exec. Law 296. State waiver of Eleventh Amendment immunity will be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 676, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)). Courts that have examined the question have consistently held that "[n]othing in the HRL [New York State Human Rights Law] provides any basis for finding that New York State has waived immunity thereunder." *Pazamickas v. New York State Office of Mental Retardation and Devel. Disabilities,* 963 F.Supp. 190, 196 (N.D.N.Y.1997). Taconic DDSO has immunity against the state claims under N.Y. Executive Law § 296.

*b. Claims against Sucato, McNeil and Bainer in their Personal Capacities*

 Plaintiff argues that individual liability should rest with Sucato, McNeil, and Bainer under N.Y. Executive Law § 296(6), which prohibits "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." Plaintiff has raised an issue of fact concerning whether these defendants aided in creating a hostile work environment at Taconic DDSO. Therefore, the claims against these individuals also survive summary judgment. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995); *Poulsen v. City of North Tonawanda, NY,* 811 F.Supp. 884, 900 (W.D.N.Y.1993).

**CONCLUSION**

For the above reasons, Plaintiff's claims relating to the incidents at Kennedy Hall are dismissed. Plaintiff's retaliation claim is also dismissed. The § 1981 and § 1983 claims and the State law claims under N.Y. Executive Law § 296 against Taconic DDSO are also dismissed.

Plaintiff's claims of disparate treatment and hostile work environment while at the Mohawk facility survive summary judgment. The claims against the individual defendants Sucato, McNeil, and Bainer in their personal capacities under federal and state law also remain.