Michael MACK, Plaintiff,

v.

The PORT AUTHORITY OF NEW
YORK AND NEW JERSEY and
Dr. Scott Bergman, Defendants.

No. 99CIV8747LTSHBP.

United States District Court,
S.D. New York.

Sept. 30, 2002.

Roosevelt Seymour, Esq., Brooklyn, NY, for Plaintiff Michael Mack.

Milton H. Pachter, Esq. by Katherine Gill Miller, Esq., New York City, for Defendants The Port Authority of New York and New Jersey and Dr. Scott Bergman.

### OPINION AND ORDER

SWAIN, District Judge.

Plaintiff Michael Mack ("Plaintiff") alleges that defendants The Port Authority of New York and New Jersey ("Port Authority") and Dr. Scott Bergman ("Dr.Bergman" [1]) (collectively, "Defendants") created a hostile work environment and subjected him to disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. He seeks damages pursuant to 42 U.S.C. section 1983 for alleged mental distress and economic loss. Plaintiff also alleges that Defendants' actions constituted intentional racial discrimination and wanton disregard of his civil rights, and seeks compensatory and punitive damages pursuant to 42 U.S.C. section 1981. In addition, based on the same set of factual allegations, Plaintiff

---

1. Bergman is spelled "Berman" in the Complaint. (*See* Defs.' Answer at 1.)

seeks damages pursuant to New York Executive Law section 296, et seq.[2] Plaintiff, whose employment with the Port Authority was terminated, also seeks reinstatement. The Court has federal question jurisdiction of Plaintiff's section 1983 and 1981 claims. *See* 28 U.S.C.A. § 1331 (West 1993). Defendants have moved for summary judgment.

For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

The following facts are undisputed. Plaintiff is African–American. (Compl.¶ 1.) The Port Authority is a bi-state agency created by a compact between the states of New York and New Jersey. (*Id.* ¶ 4.) Plaintiff commenced employment with the Port Authority in 1984. (Defs.' Mem. Supp. Summ. J. ("Defs.' Br.") at 7; Mack Aff. ¶ 4.) In 1986, Plaintiff became a Tunnel and Bridge Agent at the Holland Tunnel. (Mack Aff. ¶ 4.) One of Plaintiff's jobs in this position involved driving a wrecking truck, which required a commercial driver's license. (Defs.' Br. at 7; Tr. 5/31/2000 Mack Dep. at 64.) From 1986 through 1998, in addition to his position as a Tunnel and Bridge Agent, Plaintiff voluntarily rotated assignments, working as a stock keeper at various Port Authority sites, including La Guardia Airport, Kennedy Airport, and the World Trade Center. (Mack Aff. ¶ 5.)

Plaintiff alleges that, while he worked on the World Trade Center stockroom assignment, his supervisor, Paul Iannacone ("Iannacone"), harassed him. (Mack Aff. ¶ 6.) Plaintiff alleges generally that Ianna-

cone made offensive racial jokes, referred to Plaintiff as "boy," and said that Plaintiff was there to "appease" him. (Mack Aff. ¶ 6.) The only specific instance of racial joking identified by Plaintiff is that Iannacone allegedly made jokes about O.J. Simpson during the O.J. Simpson trial. Plaintiff generally asserts that "Whatever was going on in the media at the time, if it concerned a black person, they [sic] were jokes." (Tr. 6/27/2000 Mack Dep. at 245.) Plaintiff also asserts that Iannacone targeted non-white employees, including Plaintiff, for petty criticism, and assigned the most onerous tasks to them. (Mack Aff. ¶ 6.) The only specific instance of such alleged disparate assignments identified by Plaintiff is that, after the 1993 terrorist bombing at the World Trade Center, Iannacone scheduled non-white employees to work the night shift without the possibility of overtime, but scheduled white employees to work daytime shifts with the possibility of overtime. (*Id.* ¶ 6.) Plaintiff filed a complaint about Iannacone's alleged harassment with the Port Authority's Office of Equal Opportunity ("OEO") in 1996. (*Id.* ¶ 6.) At his deposition, Plaintiff testified that the OEO complaint concerned "[t]he way [Iannacone] spoke to me," differences in work assignments, being given shorter lunch breaks than Iannacone, Iannacone's criticism of Plaintiff's work performance as inconsistent with that of others ("maybe [that Plaintiff did not do the work in the same fashion as] a white employee") and, possibly, "a time when [Iannacone] said to me that I must appease him." (Tr. 5/31/2000 Mack Dep. at 88–89, 94.)[3] Plaintiff asserts that the Port Au-

---

**2.** In his Complaint, Plaintiff cites New York Executive Law Section 298, which concerns judicial review and enforcement of orders. *See* N.Y. Executive Law § 298 (McKinney 2001). In light of the nature of allegations in the Complaint, the Court assumes that Plaintiff is seeking relief under New York Executive Law section 296, et seq., which prohibits

discriminatory employment practices. *See* N.Y. Executive Law § 296 (McKinney 2001).

**3.** Defendants have not responded directly to Plaintiff's factual allegations concerning events in 1996 and earlier years, contending instead that any claims based on such allega-

thority did not take any action against Iannacone. (*Id.* ¶ 6.) Plaintiff alleges that, as a result of Iannacone's conduct, he suffered stress and depression, for which he was treated by a Port Authority psychiatrist on a weekly basis for one month. (*Id.* ¶ 6.)

In January 1998, Plaintiff was promoted to the position of Senior Stock Keeper and assigned to the World Trade Center stock room. (*Id.* ¶ 7.) Plaintiff alleges that Iannacone supervised Plaintiff from time to time and continued to harass him, by paying "special attention" to him and calling him a "good boy" every time he finished a task, citing Plaintiff and other non-white employees for returning later from breaks while white employees often came back late from breaks but were not reprimanded, "constantly" accusing Plaintiff and other non-white employees of "poor performance," and always sa[ying] he [Iannacone] needed to be appeased. (*Id.* ¶ 7; Tr. 5/31/2000 Mack. Dep. at 245.)

Port Authority employees who maintain a commercial driver's licenses are required to submit to random drug tests under the Omnibus Transportation Testing Act of 1991. On July 6, 1996, Plaintiff was tested for drugs and tested positive for cocaine. (8/9/96 Notice to Discipline, Ex. D. to Defs.' Notice of Mot.) Because he tested positive, the Port Authority informed Plaintiff that he would be terminated. (*Id.*)

The Transport Workers' Union negotiated a disciplinary waiver agreement for Plaintiff on August 9, 1996. (8/9/96 Disciplinary Waiver Agreement, Ex. E to Defs.' Notice of Mot.) The agreement provided that Plaintiff would submit to random drug testing for a period of sixty (60) months

and enter a drug rehabilitation program. (*Id.*) The agreement also provided that, if Plaintiff tested positive again, he would be subject to administrative action. (*Id.*) In addition, the agreement provided that Plaintiff would attend psychological counseling sessions. Plaintiff was referred to Bergman, a clinical psychologist at the Port Authority's Office of Medical Services. (Mack Aff. ¶ 8.) [4]

Plaintiff alleges that Bergman was cold and disdainful toward him because Plaintiff is African–American. Plaintiff asserts that he felt that Bergman provided no meaningful counseling because the sessions generally lasted no more that five minutes and Bergman would only make "small talk" with him. (*Id.* ¶ 9.)

On November 10, 1997, Plaintiff again tested positive for cocaine. (Tr. 6/27/2000 Mack Dep. at 185.) The Port Authority notified Plaintiff that his employment would be terminated on November 17, 1997, as a consequence of the positive drug test. (11/17/97 Notice of Intention to Discipline, Ex. F. to Defs.' Notice of Mot.) Plaintiff entered into another disciplinary waiver agreement negotiated by his union, in which he agreed to random drug testing for sixty (60) months and to cooperate with the Port Authority's Office of Medical Services. The agreement provided that failure to meet these obligations could result in termination and that one positive test result would result in his termination. (11/17/1997 Settlement Agreement, Ex. G. to Defs.' Notice of Mot.)

On May 6, 1998, the Port Authority's Office of Medical Services instructed that Plaintiff to report to that office for a drug test. Plaintiff provided a urine sample to the Medical Services nurse. The nurse

___

tions are time-barred. *See* discussion *infra* p. 18.

4. There is some dispute as to whether the referral to Bergman was for counseling as

such. (*Compare* Mack Aff. at 8 *with* Tr. 6/2/2000 Bergman Dep. at 14.) This issue of fact is not, however, material in the context of this motion.

told Plaintiff that the sample was not registering on the temperature strip on the specimen cup and called Dr. Bergman. Dr. Bergman examined the sample and also determined that the sample was not registering on the temperature strip. Dr. Bergman instructed Plaintiff to submit another sample. (Mack Aff. ¶ 13; Tr. 6/2/2000 Bergman Dep. at 51.)

Plaintiff alleges that Dr. Bergman stated that the "only person with a temperature like [Mack's sample] is either dead or an animal." (Mack Aff. ¶ 13.) Plaintiff was incensed by Dr. Bergman's remark and allegedly told him that he "was not willing to participate in any further test" until he spoke with his union representative, Steve Picone ("Picone"). (*Id.*) Dr. Bergman allegedly informed Plaintiff that, if he left the Office of Medical Services without providing another sample, there would be "trouble." (*Id.; cf.* Medical Dep't Chart Summary, Ex. I. to Defs.' Notice of Mot.) While there is some dispute as to the particulars of the parties' verbal interaction, it is undisputed that Plaintiff left the Medical Services office without providing an additional sample. (*See, e.g.,* Mack Aff. at ¶¶ 13, 14, 16.) Plaintiff returned to his work area and called Picone. (Mack Aff. ¶ 13, Tr. 5/31/2000 Mack Dep. at 145.) After speaking with Picone, Plaintiff's stock room supervisor told Plaintiff that he had to leave the building (*Mack Aff.* ¶ 14; Tr. 5/31/2000 Mack Dep. at 146) because he refused to provide a second urine sample. (Defs.' Br. at 10.) Port Authority security personnel then escorted Plaintiff out of the building. (Mack Aff. ¶ 14.) Plaintiff received a notice of termination the next day (May 7, 1998) based on his failure to provide a second urine specimen. (*Id.* ¶ 15; 5/7/98 Port Authority Letter to Mack, Ex. K to Defs.' Notice of Mot.)

Plaintiff asserts that the alleged harassment by Iannacone and the alleged disdainful treatment by Dr. Bergman, as well as Dr. Bergman's alleged comment about the temperature of Plaintiff's May 6, 1998 urine sample and request for a second sample, and the subsequent termination of his employment, were racially motivated. Defendants seek summary judgment, asserting that any cause of action based on alleged 1996 or earlier conduct of Iannacone is time-barred, that the conduct of Iannacone and Dr. Bergman was not sufficiently severe and pervasive to support a hostile work environment claim, that Plaintiff's termination was legitimately based on his failure to cooperate in accordance with the disciplinary waiver agreement, and that Dr. Bergman is entitled to qualified immunity.

### DISCUSSION

#### Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The trial court must view the record in the light most favorable to the non-moving party and resolve all uncertainties and draw all reasonable inferences against the moving party. *Hill v. Taconic Dev. Disabilities Services Office,* 181 F.Supp.2d 303, 316 (S.D.N.Y.2002) (citing *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996)). A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 74 (2d Cir.2001); *Hill,* 181 F.Supp.2d. at 316; *Turner v. Nat'l R.R. Passenger Corp.,* 181 F.Supp.2d 122, 126 (N.D.N.Y.2002). "Affi-

davits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination." *Turner*, 181 F.Supp.2d at 127 (citing *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir.1994)). Nevertheless, the court may grant summary judgment when defendants present convincing evidence to explain their actions and plaintiff's assertions are comprised of purely conclusory allegations of discrimination. *Id.* (citations omitted).

*Claims Under 42 U.S.C. Section 1981 and 42 U.S.C. Section 1983*

 The Court first examines Plaintiff's federal claims. Plaintiff seeks relief for the alleged discrimination under 42 U.S.C. section 1981 ("Section 1981")[5] and 1983 ("Section 1983")[6]. Section 1981 prohibits intentional, race-based discrimination in the workplace. *Turner*, 181 F.Supp.2d at 127–28. In order to bring a successful claim under Section 1983, a plaintiff must show in the first instance

that: "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges." *Emblen v. Port Auth. of New York/New Jersey*, No. 00 Civ. 8877, 2002 WL 498634, at *3 (S.D.N.Y. Mar. 29, 2002), 2002 WL 498634, (quoting *Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 354 (E.D.N.Y.1999) (internal quotation marks omitted)). *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998).

*Liability of the Port Authority*

 Plaintiff's claims in this action are premised entirely on the alleged actions of two Port Authority employees— Iannacone, who is not named as a defendant here, and Dr. Bergman. The Port Authority, a municipality,[7] cannot be held liable in a Section 1983 or Section 1981 action solely on the basis of *respondeat superior*.[8] *See Purdy v. Town of Green-*

---

5. Section 1981 provides, in pertinent part:

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 42 U.S.C.A. § 1981 (West 1994).
 The Civil Rights Act of 1991 amended Section 1981, adding subsection (c), which provides that "[t]he rights protected by this Section are protected against impairment by nongovernmental discrimination and impairment under color of state law."

6. Section 1983 provides, in pertinent part:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

party injured in an action at law, suit in equity, or other proper proceeding for redress ....
42 U.S.C.A. § 1983 (West 1994).

7. Although the Port Authority, a bi-state agency, is not technically a municipality, courts have treated it as such and have analyzed claims against it under the standards governing municipal liability under Section 1983. *See Brady v. Port Auth. of New York and New Jersey*, Nos. 93 Civ 1679(NG)(CLP), 95 Civ. 0442(NG)(CLP), 1998 WL 724061, at *2 (E.D.N.Y.1998); *Shifa Services, Inc. v. Port Auth. of New York and New Jersey*, No. 96 Civ. 1361(AGS), 1997 WL 563301, at *2–3 (S.D.N.Y.1997); *Settecase v. The Port Auth. of New York and New Jersey*, 13 F.Supp.2d 530, 537 (S.D.N.Y.1998).

8. The Port Authority is not treated as a state for sovereign immunity purposes and thus is not entitled to Eleventh Amendment immunity. *See Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994); *Emblen*, 2002 WL 498634, at *4.

*burgh,* 166 F.Supp.2d 850, 869 (S.D.N.Y. 2001) (citing *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995)) (internal quotations marks omitted) (municipality not liable in Section 1983 actions for conduct "alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior* "); *Settecase,* 13 F.Supp.2d at 537 (as a municipal agency, Port Authority cannot be held vicariously liable for acts of its employees in Section 1983 actions); *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 721, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (Section 1981 does not impose vicarious liability on municipalities for employee decisions made in their course of official duties and Section 1983 provides exclusive federal damages remedy for violation of Section 1981). Although there is no authority from the Second Circuit on the effect of the 1991 amendment on Section 1981, the Court finds persuasive the Fourth Circuit's conclusions in *Dennis v. Fairfax,* 55 F.3d 151 (4th Cir.1995)—that the amendment did not disturb the holdings in *Jett* that (1) there is no direct cause of action under Section 1981 and (2) satisfaction of the standard set forth in *Monell v. Dep't of Soc. Serv. of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) remains a prerequisite to municipal liability under Section 1983. *See also Ebrahimi v. City of Huntsville Bd. of Educ.,* 905 F.Supp. 993, 995 n. 2 (N.D.Ala. 1995); *Johnson v. City of Fort Lauderdale,* 903 F.Supp. 1520, 1522–23 (S.D.Fla. 1995); *Butts v. County of Volusia,* 222 F.3d 891 (11th Cir.2000) (1991 amendment did not create implied cause of action in Section 1981 actions against state actors); *Philippeaux v. N. Cent. Bronx Hosp.,* 871 F.Supp. 640, 655–56 (S.D.N.Y.1994) (*Jett* accurately states the law regarding municipal liability in Section 1981 actions). *But see Federation of African American Contractors v. City of Oakland,* 96 F.3d 1204, 1209–10 (9th Cir.1996) (1991 revision not intended to impose respondeat superior liability on municipalities but did create an implied cause of action against state actors, relieving plaintiffs from suing under Section 1983).

■ The amendment made explicit the reach of Section 1981 to cover private conduct as fully as state conduct (overruling *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)). It does not address remedies, thus leaving untouched the judicial implication of a private right of action under Section 1981. Nor does the amendment alter *Jett* 's holding that the specific remedial provision available under Section 1983 with respect to state actors for violation of federal statutory rights precludes any implication of a direct of right of action under Section 1981. With the remedy channeled through Section 1983, the "under color of any statute, ordinance, regulation, custom, or usage, of any State" criterion of that statute still applies and thus strict *respondeat superior* liability remains precluded.

■ A municipality may be held liable under Section 1983 when there is a deprivation of rights pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. 658 at 690, 98 S.Ct. 2018, 56 L.Ed.2d 611. *See also Emblen,* 2002 WL 498634 at *4. When there is no explicit enactment, a plaintiff may prove "existence of a widespread practice that although not authorized by written law or express municipal policy, is so 'permanent and well settled as to constitute a custom or usage with the force of the law.'" *Id.,* 2002 WL 498634 at *4.

*Wrongful Termination Claim Against Port Authority*

■■ Because Plaintiff's Section 1981 claim against Port Authority is actionable only under Section 1983, Plaintiff must

**384**

demonstrate that he was wrongfully terminated on the basis of race as the result of a Port Authority custom or policy. Having reviewed thoroughly Plaintiff's complaint and his submissions in opposition to this motion, the Court finds that Plaintiff has not alleged facts sufficient for the Court to find that it was the custom or practice of the Port Authority to treat Plaintiff or other non-white employees differently from non-black employees when imposing sanctions for failure to comply with urine testing requirements. Plaintiff merely makes conclusory allegations that "race was the determining factor in [his] termination." (Mack Aff. ¶ 17.)

*Hostile Work Environment Claim Against Port Authority*

■ With respect to causes of action based on hostile work environments, it is not sufficient for a Section 1983 plaintiff to demonstrate that a supervisor created a hostile work environment. Rather, a plaintiff must also show that it was the policy or custom of the municipality to maintain a hostile work environment or that the municipality had a policy or custom of deliberate indifference to existence of a hostile work environment. *See Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir.2000) (plaintiff has burden to show that the challenged conduct of a given official represents official policy in Section 1983 action); *Annis*, 136 F.3d at 248 (municipality liable for sex discrimination under Section 1983 for actions of municipal policy makers); *see also Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 145 n. 1 (3d Cir.2002) (superintendent not liable under Section 1983 for sexual harassment because incidents were not brought to attention of a supervisory or policy-making official of the administration); *Vela v. Vill. of Sauk*, 218 F.3d 661, 665 (7th Cir.2000) (plaintiff failed to produce evidence of policy or custom of sexual harassment to hold municipality liable under Section 1983).

■ Here, Plaintiff has not alleged (much less come forward with evidence to support such a proposition) that Iannacone, Bergman, or the person to whom he allegedly complained about Iannacone's conduct in 1996 was entitled to make policy for the Port Authority. *Cf. Jett*, 491 U.S. at 737, 109 S.Ct. 2702 ("identification of those who decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury"). Nor has Plaintiff proffered any facts that could support a finding that the Port Authority had a policy of deliberate indifference to the creation or maintenance of racially hostile work environment. Rather, he has merely made vague and conclusory assertions of "disrespect, disdain, and generally hostile work environment to which [Plaintiff] and other non-white employees are subjected by Port Authority's white personnel at the World Trade Center site" (Mack Aff. ¶ 2) and a "racially hostile atmosphere at the World Trade Center site." (*Id.* ¶ 8.) At this stage of the litigation, where discovery has been completed, such generalized assertions are insufficient to frame a material issue of fact for determination by a jury. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 334, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (generalized assertions insufficient to create a genuine issue of material fact); *Cf. Nicholas v. Miller*, 189 F.3d 191, (2d Cir.1999) (conclusory assertions usually not enough to resolve factual disputes that would otherwise preclude summary judgment). Thus, even reading Plaintiff's factual allegations in the light most favorable to him, including assuming that a hostile work environment existed, the Port Authority is entitled as a matter of law to summary judgment on the Section 1981 and Section 1983 claims asserted against it.

*Plaintiff Fails to Carry his Burden on the Merits*

Even if Plaintiff had satisfied the *Monell* test for his claims of wrongful termination and hostile work environment, dismissal of those claims would nonetheless be appropriate because he has not alleged facts supporting his discriminatory termination and hostile work environment claims that are sufficient to withstand summary judgment.

*Wrongful Termination*

■ Because Section 1981 and Section 1983 employment discrimination claims are analyzed within the Title VII framework, the Court applies the three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Turner*, 181 F.Supp.2d at 131. In the context of a motion for summary judgment, Plaintiff must first establish a *prima facie* case of discrimination, after which the defendant has the burden of providing evidence that demonstrates a legitimate, nondiscriminatory reason for the conduct complained of. *Id.* at 134. To establish a *prima facie* case, Plaintiff must show that he (1) belongs to a protected class; (2) suffered adverse employment action; (3) was performing his duties satisfactorily; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. 1817. If Plaintiff establishes the *prima facie* case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden of proof shifts to the employer to "articulate some legitimate nondiscriminatory reason for the employer's" action. *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335–36 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). If the employer meets this burden, Plaintiff must show that the proffered reason is false and that

discrimination is the real motive behind the employment action. *Hill*, 181 F.Supp.2d at 317 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ Plaintiff claims that he suffered termination, an adverse employment action, by reason of unlawful racial discrimination. It is unclear whether Plaintiff could even be found to have made out a *prima facie* case here, in that he has not shown that he was performing his duties satisfactorily. Indeed, the undisputed evidence shows that he failed to cooperate in the drug-testing process as required by his August 9, 1996 and November 17, 1997 disciplinary waiver agreements and applicable law. Plaintiff has not proffered any evidence tending to show that he was similarly situated to white employees who also were subject to a drug-testing regime, and has not alleged that any such white employees were treated differently. Furthermore, as explained below, his allegations with respect to Dr. Bergman's conduct and the circumstances surrounding his termination are too conclusory to support an inference (as opposed to an assumption, such as that made by Plaintiff) of discrimination. The court need not find for Defendants solely on this ground, however, because Plaintiff has failed to come forward with evidence sufficient to carry his ultimate burden. Even assuming that Plaintiff has met the *McDonnell Douglas* test for establishing a *prima facie* case, he has not provided evidence sufficient to create a jury issue as to whether the Port Authority had a nondiscriminatory reason for terminating his employment.

In response to Plaintiff's charge of wrongful termination, the Port Authority has articulated a legitimate non-discriminatory reason for Plaintiff's termination, namely that Plaintiff failed to cooperate in a drug test required under DOT regula-

tions by giving a second urine sample when the first failed to register within the appropriate range on the temperature strip. *See* 49 C.F.R. 40.65(b)(1) (2002). Under the applicable regulations, such conduct merited the same administrative action as a positive drug test result. *See* 49 C.F.R. 40.23 (2002) ("when an employee has a verified positive, adulterated, or substituted test result,[9] or has otherwise violated a DOT agency drug and alcohol regulation, [the employer] must not return the employee to the performance of safety-sensitive functions until or unless the employee successfully completes the return-to-duty process . . . ").

The record reflects that the Port Authority acted in accordance with the November 1997 disciplinary waiver agreement negotiated by Plaintiff's union—which provided that Plaintiff agreed "to cooperate fully with the recommendations of the staff of the Office of Medical Services" (11/17/97 Disciplinary Waiver Agreement, Ex. G to Defs.' Notice of Mot., ¶ 1A) and that "[i]n the event that Michael Mack fails to comply with any of his obligations hereunder, the Port Authority may request further action up to and including termination." (*Id.* ¶ 1E.) In addition, the arbitration decision upholding the termination of Plaintiff's employment, although not preclusive on the issue of proper grounds for the termination, is further evidence of a legitimate, nondiscriminatory basis. *See Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001) (prior administrative findings may provide a nondiscriminatory reason for termination under the *McDonnell Douglas* burden-shifting construction, after the plaintiff established a *prima facie* case).

Plaintiff, on the other hand, has failed entirely to come forward with evidence showing that the proffered non-discriminatory reason is pretextual and that racial discrimination was the real motive behind the termination. He proffers only his subjective interpretation of Dr. Bergman's alleged remark as a justification for his refusal to provide a contemporaneous second urine sample. He does not even attempt to allege that any similarly-situated white employees were spared termination under similar circumstances Plaintiff thus has failed to establish the existence of a genuine fact issue with respect to the Port Authority's proffer of a legitimate nondiscriminatory reason. *See, e.g., Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 99 (2d Cir.2001) (employees' conclusory statements were unsupported by the record and insufficient to rebut employer's proffered legitimate, nondiscriminatory reasons for termination of employment); *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000) (black plaintiff's showing that similarly situated non-black employees were treated more favorably can serve as evidence that employer's proffered legitimate, non-discriminatory reason for adverse employment action was a pretext for racial discrimination); *Mauro v. S. New England Telecomm., Inc.,* 208 F.3d 384, 387–88 (2d Cir.2000) (employee provided no evidence that employer's proffered legitimate, non-discriminatory reasons for promotions to other employees were pretextual); *Cf. Ames v. Cartier,* 193 F.Supp.2d 762, 772 (S.D.N.Y.2002) (plaintiff offered evidence sufficient to raise a material issue of fact as to whether employer's proffered legitimate, nondiscriminatory reason for discharge was pretext for sex and national origin discrimination).

Plaintiff having failed to proffer evidence sufficient to sustain his burden on the wrongful termination claim, both De-

---

**9.** A verified adulterated or substituted test result is interpreted as a refusal to take a drug test. *See* 49 C.F.R. 40.191(b) (2002).

fendants are entitled to judgment on this claim as a matter of law.

*Racially Hostile Work Environment*

Plaintiff has not come forward with facts showing that the alleged hostile actions or altered work conditions were sufficiently severe and pervasive to sustain his claims premised on a racially hostile work environment.

■■■ The existence of an actionable hostile work environment is analyzed, for Section 1981 and 1983 purposes, under principles consistent with those applied in Title VII cases. *See Abouzied v. Roy H. Mann Jr. H.S.*, No. 78, No. 97–CV–7613, 2000 WL 1276635 at \*3, n. 1 (E.D.N.Y. August 30, 2000) (citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 347, n. 2 (7th Cir.), *cert. denied*, 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999)) (Section 1981 claims are analyzed under Title VII law); *Jemmott*, 85 F.3d at 67 (courts regularly utilize Title VII law when considering Section 1983 equal protection claims). To sustain a hostile work environment claim, the plaintiff must demonstrate that the workplace was "permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■■■■ Whether the discrimination is "severe or pervasive" depends on "(1) the frequency and severity of the discriminatory conduct; (2) whether the conduct was physically threatening or humiliating; (3) or a 'mere offensive' utterance; (4) whether the conduct reasonably interfered with

[P]laintiff's work, and (5) the nature of the psychological harm suffered by [P]laintiff, if any." *Turner*, 181 F.Supp.2d at 132 (citing *Harris v. Forklift Systems*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). *See Hill*, 181 F.Supp.2d at 320–21. These factors should be considered cumulatively. *Raniola*, 243 F.3d at 617 (quoting *Richardson v. New York State Dep't of Corr. Service*, 180 F.3d 426, 437 (2d Cir.1999)). Plaintiff must also show that the environment was both objectively and subjectively hostile.[10] *Raniola*, 243 F.3d at 620. Furthermore, Plaintiff must show that the working environment actually constituted discrimina[tion] … because of [race]. *Hill*, 181 F.Supp.2d at 321 (quoting *Ricks v. Conde Nast Publ'n, Inc.*, 6 Fed.Appx. 74, 2001 WL 27385, at \*3 (2d Cir.2001) (citations omitted)).

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to meet his burden of demonstrating that his supervisor, Iannacone, or Dr. Bergman (collectively or individually) subjected him to a hostile work environment.

■■■ The Court must first address the temporal scope of the allegations that may be taken into account in determining whether Plaintiff's evidence is sufficient to withstand Defendants' motion for summary judgment. Defendants argue that all alleged conduct outside of the three-year statute of limitations period for Section 1983 and 1981 actions must be disregarded. Although Defendants' position is generally consistent with most of the relevant case law under Section 1981 and 1983,[11] the Supreme Court's June 2002 de-

---

10. The Second Circuit has rejected the "reasonable black person" standard advocated by Plaintiff. *See Richardson*, 180 F.3d at 436 (perspective of particular ethnic or gender group is not the proper standard under Title VII).

11. *See e.g., Connolly v. McCall*, 254 F.3d 36, 40 (2d Cir.2001) (federal constitutional claims brought under Section 1983 are governed by a three-year statute of limitations); *Wilson v. Fairchild Republic Co. Inc.*, 143 F.3d 733, 739 n. 5 (2d Cir.1998) (statute of limitations of federal civil rights cases is three years, including Section 1981 claims).

cision in *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) casts doubt upon this proposition insofar as Plaintiff asserts a hostile work environment claim. In *Morgan,* the Court addressed in the Title VII context, the question of whether acts allegedly comprising a hostile work environment could be taken into account to the extent those acts fell outside Title VII's 180–or 300–day limitations period for the filing of a charge with the federal Equal Employment Opportunity Commission. Finding that a hostile work environment is itself an "unlawful employment practice" that occurs over a series of days or perhaps years and that "the incidents compromising a hostile work environment are part of one unlawful employment practice," the Court held that, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.,* 536 U.S. at —— – ——, 122 S.Ct. 2061, 153 L.Ed.2d 106, 70 U.S.L.W. at 4528–29. As noted above, Title VII standards for the assessment of hostile work environment claims generally govern the analysis of such claims under Sections 1981–1983.

If, for Title VII purposes, a hostile work environment claim is deemed to encompass all conduct that can be proven part of the same unlawful employment practice whether or not each instance of such conduct occurred within the relevant filing limitations period, it stands to reason that, as long as some of the conduct occurred within the relevant limitations period, the statute of limitations applicable to Section 1981 and 1983 claims should not bar consideration of all the conduct claimed to constitute a hostile work environment in a claim brought pursuant to those statutory provisions. Here, there is no dispute that some of the conduct complained of allegedly occurred as late as 1998—well within

the three-year period. The Court has therefore considered all of Plaintiff's allegations in determining whether Plaintiff has alleged a sufficient factual basis for the existence of a racially hostile work environment to preclude summary judgment in Defendants' favor on that claim.

*Iannacone*

■ The bulk of Plaintiff's allegations as to Iannacone's conduct are vague and conclusory. Plaintiff asserts that Iannacone made racially offensive jokes but does not detail their content or frequency, and provides only one example of subject matter—the O.J. Simpson trial. Plaintiff asserts that Iannacone called him a "boy" but the only specific language recounted is the alleged remark "good boy" upon completion of assignments. "Petty criticisms" of nonwhite workers and disparate work assignments are alleged, but the only specific example given is of an alleged 1993 difference in shift times and overtime eligibility. There is only a generalized assertion of disparate enforcement of lunch and break limitations. No specifics are proffered as to the nature of the "special attention" allegedly paid to Plaintiff's conduct after he returned to the World Trade Center stockroom in 1998. Plaintiff's allegations do not demonstrate that Iannacone's conduct was sufficiently "extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (Title VII is not intended to be a "general civility code") (citation omitted).

Even accepting Plaintiff's allegations as true, Iannacone's alleged actions do not rise to the level of being so frequent, severe, threatening or humiliating as to rise to the level of a hostile work environment claim. *Holtz,* 258 F.3d 62, 75 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will

not amount to discriminatory changes in the terms and conditions of employment.") (quoting *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275); *see also, Abouzied,* 2002 WL 1276635 at *5 (supervisor's discriminatory comment, unfair reprimands, and assigning Plaintiff more difficult tasks were insufficient to establish a *prima facie* case of discrimination). Although the Court accepts as true for the purposes of this analysis Plaintiff's assertions that he perceived the work environment as hostile on account of race, the evidence he proffers is insufficient to satisfy the objective prong of the hostile work environment analysis— that the conduct was so severe and pervasive that a reasonable person would find the environment hostile or abusive on account of race. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *Brennan v. Metro. Opera,* 192 F.3d 310, 318 (2d Cir.1999); *Richardson,* 180 F.3d at 440.

Plaintiff's evidence is insufficiently specific to enable a jury to assess objectively the underlying conduct. The specific instances complained of are not ones that could reasonably be construed to have altered the conditions of Plaintiff's employment, even taking into account the totality of the factual circumstances as allegedly by Plaintiff. *See, e.g., Snell v. Suffolk County,* 782 F.2d 1094, 1098 (2d Cir.1986) ("proliferation of racially derogatory 'literature' posted on bulletin boards . . . photographs favorably portraying the Klu Klux Klan . . . [and] a picture of a black man with a noose around his neck" was sufficiently severe and pervasive to merit a finding of a hostile work environment); *Brown v. Middaugh,* 41 F.Supp.2d 172, 188 (N.D.N.Y.1999) (calling African–American deputy "nigger," referring to Black inmates as "niggers," and making Nazi salutes to inmates, were not sufficiently severe and pervasive to create hostile work environment); *Richardson,* 180 F.3d at 439 (working conditions altered where, over the course of the plaintiff's three and

one-half year employment, a supervisor "referred to Blacks as 'apes or baboons' and stated that African–Americans are 'so dark you cannot see them anyway,' one co-worker referred to plaintiff as a 'light-skinned nigger,' another called her 'nigger,' yet another went out of his way on one occasion to use the word nigger in her presence, others circulated a joke that disparaged Blacks and referred to them as 'niggers,' while still others used the terms 'spooks' and 'Buckwheats' to refer to African–Americans"); *Williams v. New York City Hous. Auth.,* 154 F.Supp.2d 820, 823 (S.D.N.Y.2001) (work environment found to be sufficiently severe and hostile where two African–American employees alleged that their white supervisor displayed noose in his office for three days until one of the plaintiffs asked him to take it down).

Plaintiff's conclusory allegations, without more, are not enough to sustain a hostile work environment claim based on Iannacone's conduct. *See Schwapp,* 118 F.3d at 110 (district court properly declined to rely on affidavits lacking any specific instances of racially discriminatory conduct and that were replete with conclusory allegations of a racially hostile work environment). *See also, Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) (motion for summary judgment will not be denied on conjecture or assumptions); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (Second Circuit has consistently held that a plaintiff opposing a summary judgment motion must provide evidence sufficient for a fact finder to render a verdict in his favor); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (unsupported allegations do not create material issues of fact to preclude summary judgment).

*Dr. Bergman*

■■■ Nor does Plaintiff's assertion that Dr. Bergman's alleged conduct constituted

part of the same hostile work environment provide a sufficient factual basis for a finding that such an environment involving race-based conduct by Iannacone existed. "To withstand summary judgment, a 'plaintiff must show that either a single incident was extraordinarily severe, or that series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment.'" *Whidbee v. Garzarelli Food*, 223 F.3d 62, 69 (2d Cir.2000) (citations omitted). Plaintiff has proffered no facts to show that alleged actions of Dr. Bergman, who worked in an entirely different unit and was not Plaintiff's supervisor, should be considered concerted with those of Iannacone, or that there was any continuity between the two men's conduct. Plaintiff's simply asserts that "[t]he racially hostile atmosphere ... carried over to other employees of the Port Authority such as Dr. Scott Bergman a clinical psychiatrist who worked at the office of Medical Services." (Mack Aff. ¶ 8.) This conclusory assertion is plainly insufficient to support a finding of continuous or concerted action as between the two men to create a hostile work environment.

 As to whether Dr. Bergman's alleged actions, standing alone, are sufficient to enable Plaintiff's hostile work environment claim to withstand summary judgment, the answer must again be in the negative. Plaintiff's allegations in this regard are again conclusory—he asserts that Dr. Bergman was disdainful and failed to provide him with counseling consistent with Plaintiff's expectations, and just as summarily asserts that these shortcomings were "clearly due to racism." (*See* Mack

Aff. ¶¶ 9, 13, 17.) Similarly with respect to the alleged comment referring to the temperature of the urine sample being similar that of a dead person or an animal, only Plaintiff's subjective conclusion that he "interpreted Dr. Bergman's remark about an 'animal' as racist" is proffered to support the assertion that Dr. Bergman's conduct was part, or symptomatic of a hostile work environment. There is no objective indicator of a basis for an inference of racially discriminatory conduct. Plaintiff's evidence is thus again insufficient, at this summary judgment stage, to frame an issue of fact for the jury as to whether there was conduct severe and pervasive enough to constitute a race-based hostile work environment.[12]

Although Plaintiff also asserts that Dr. Bergman's allegedly discriminatory conduct is part of a larger pattern at the Port Authority, he has not provided evidence of such a pattern. Plaintiff's deposition reveals that Dr. Bergman's "cold and disdainful attitude toward [him]," which Plaintiff asserts "was clearly due to racism" (Mack Aff. ¶ 9), consisted of Dr. Bergman asking after Plaintiff's health and inquiring whether he had relapsed into drug use. (Tr. 6/27/2000 Mack Dep. at 279, Defs.' Ex. N to Notice of Mot.) Plaintiff's conclusory allegations of discrimination do not create a material issue of fact for the jury. *See Ghose v. Century 21*, 108 F.Supp.2d 373, 379 (S.N.N.Y.2000) (plaintiff's conclusory allegations of discrimination were insufficient to defeat employer's motion for summary judgment). Moreover, Plaintiff's evidence is insufficient to connect Dr. Bergman's actions with Iannacone's actions in any sort of pattern of

---

12. The fact that Dr. Bergman was not Plaintiff's supervisor or even co-worker, and that there is no allegation of any complaints to Port Authority supervisory personnel regarding Dr. Bergman's alleged conduct, are of course further impediments to any attempt to make out an actionable hostile work environment claim, at least as against the Port Authority. The Court need not address this issue because, as shown above the facts as alleged by Plaintiff are insufficient to support a finding of a hostile work environment.

discrimination that would provide a basis for holding the Port Authority vicariously liable for the alleged conduct of the two individuals.

For all of the foregoing reasons, Defendants are entitled to judgment as a matter of law on Plaintiff's hostile work environment claim.

*State Law Claims*

 Based on the same set of factual allegations, Plaintiff also seeks relief pursuant to New York Executive Law section 296, *et seq.* However, New York anti-discrimination laws do not apply to the Port Authority because it is a bi-state agency created by compact. *See Evans*, 192 F.Supp.2d at 281–82 (New York anti-discrimination laws do not apply to the Port Authority or its agents acting in their official capacity); *Barbella v. N.Y., N.J. Port Auth.*, No. 97 Civ. 8553, 1999 WL 1206692, at *4 (S.D.N.Y. Dec. 15, 1999) (New York Human Rights Law does not apply to Port Authority, a bi-state agency); *Rose v. Port Auth. of New York & New Jersey*, 13 F.Supp.2d 516, 523–24 (S.D.N.Y. 1998) (New York Human Rights Laws did not apply to Port Authority because the Port Authority is a bi-state agency and exempt from municipal regulation). Plaintiff's state law claims, therefore, are dismissed.

### CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Defendants, dismissing Plaintiff's 42 U.S.C. section 1981, 42 U.S.C. section 1983, and state law claims.

SO ORDERED.